IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 1, 2005

## STATE OF TENNESSEE v. CARLOS SOMMERVILLE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-07874   J.C. McLin, Judge**

---

**No. W2004-01083-CCA-R3-CD  - Filed March 30, 2005**

---

The Defendant, Carlos Sommerville, was convicted  of second degree murder, first degree felony murder, and attempted first degree murder.  On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his convictions; and (2) the trial court erred when it admitted certain autopsy x-rays and photographs into evidence at trial.  Finding no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, and ALAN E. GLENN, JJ., joined.

Larry Nance (at trial) and Garland Ergüden (on appeal), Memphis, Tennessee, for the appellant, Carlos Sommerville.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Tom Hoover and Vanessa King, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I.  Facts

This case arises from the shooting and subsequent death of the victim, Marcus Crawford. In regards to this incident, the Shelby County Grand Jury indicted the Defendant for first degree premeditated murder, first degree felony murder, and attempted first degree premeditated murder. At the Defendant's trial, the following evidence was presented: Qushebia Sherrod testified that, on the morning of October 31, 2001, she was lying on her couch in her apartment at the Orchid Manor apartments when she heard people arguing outside.  She was unable to tell what the argument was about, but she said it lasted for approximately ten minutes.  Sherrod recalled that she heard a gunshot and sat up to look outside.  She said that she saw a man standing on the driver's side of a car and shooting at someone inside the car.  Sherrod testified that the shooter fired two more shots into the

window of the car. She explained that the car was moving and ended up running into a dumpster on the curb, with the tires spinning in the dirt. Sherrod recalled that the shooter pocketed the gun and ran off towards a "cut through" to the adjacent park. She said that she was about twenty feet away when she witnessed the shooting. She could not identify the shooter, but recalled that he was a black male.

On cross-examination, Sherrod testified that she saw the shooter pointing a gun at the driver's side window of the car and heard the gunshots, but she did not see a muzzle flash come out of the weapon. She said that she watched the events transpire until the shooter ran off, then she yelled for her fiancé, who was also in the apartment, to call the police. Sherrod recalled that a woman appeared at the scene after the shooter ran off, and she was yelling for someone to get out of the car. She said that she did not know the woman, but had seen her before. She admitted that she previously told the police that she did not see the gun that the shooter used. On redirect examination, Sherrod affirmed that she saw the shooter point the gun at the car and pull the trigger.

Sheaner Crawford, the victim's father, testified that he worked for housekeeping at a local medical center, on October 31, 2001, and he received a call that his son, Marcus Crawford, had been shot. He said that he went down to the emergency room but was not allowed to see his son. Sheaner Crawford recalled that he saw his son later that afternoon in the trauma center, and he recalled that his son's "head was swollen . . . [h]e couldn't move . . . and lost a lot of everything." He explained that, for a few days, his son would move his eyes, apparently responding to people who spoke to him, but later he was completely unconscious. Sheaner Crawford said that his son remained in the hospital for a while and was then moved to a nursing home, where he died about two months later.

Dr. Cynthia Gardner testified that she is the medical examiner who conducted Marcus Crawford's autopsy on March 26, 2002. She said that Crawford died as a result of complications from a gunshot wound to the head. She said that Crawford was a "delayed death." The doctor explained that Crawford had many medical problems following the gunshot to his head, one of which was a blood clot that formed as a result of Crawford's immobility. The blood clot traveled to and blocked the blood flow to Crawford's lungs, killed part of the lungs, causing an infection, which ultimately resulted in Crawford's death. Dr. Gardner testified that she saw no external evidence of the gunshot wound to Crawford's head, but she observed external evidence of surgical procedures that had been performed on Crawford's skull. She said that Crawford had received two craniotomies, in which portions of his skull and brain were removed, including the portion of his skull through which the bullet had entered. She produced two x-rays that depicted the missing area of the skull and the bullet in Crawford's brain. Dr. Gardner recalled that, when she examined Crawford's brain, she observed that portions of the brain had been removed, and she observed discoloration of some brain tissue, which indicated healing from an old injury to the brain. Based on the discoloration, she concluded that the brain damage was caused by the bullet entering Crawford's brain. Further, the doctor noted, Crawford suffered extensive damage from oxygen deprivation to the brain. She recalled that Crawford had bedsores and atrophied muscles from prolonged immobility, and she said that prolonged immobility causes blood clots. Dr. Gardner produced a photograph of a cross section of Crawford's lung, and she explained how a blood clot

entered the lung, blocked blood flow to two areas, and killed portions of the lung. She explained that she found evidence of infection in these areas of lungs, and she concluded that this infection was the ultimate cause of Crawford's death. Dr. Gardner testified that the bullet she removed from Crawford's brain was tarnished, indicating that the bullet had been inside the body for some time.

On cross-examination, Dr. Gardner testified that, although her autopsy report does not state that there was an "infection," the report indicates the presence of the body's reaction to infection. She explained that cultures and stains for bacteria are not very effective in autopsies, and, therefore, the medical examiners generally look for signs that the body has fought an infection. Dr. Gardner testified that she reviewed Crawford's medical records, from the date of his gunshot injury until his death, and patient notes provided by the nursing home where Crawford spent his last months. She found no evidence in Crawford's medical records that he had been given Hepperin, a drug used to help prevent the formation of blood clots, and her toxicology tests did not reveal Hepperin in Crawford's system, but she was not sure if the tests specifically tested for Hepperin. Additionally, Dr. Gardner testified that Crawford's toxicology results revealed a level of Dilantin in his system, measured at 38.2 micrograms per milliliter, and she admitted that this was within the toxic levels of Dilantin. She explained, however, that the effective dosage varies from person to person. Further, she testified that the toxic effects of the drug are dizziness and confusion, and a lethal dose would be a much higher level. The doctor could not be certain where the blood clots that killed Crawford originated, and she noted that Crawford's medical records indicated a history of blood clots in his arms. She admitted that there are many different causes of blood clots. On redirect-examination, Dr. Gardner testified that it would be unusual for a normal healthy person to develop blood clots.

Laverne Jones, an officer with the Memphis Police Department, testified that he collected the evidence at the Orchid Manor apartments after the incident on October 31, 2001. Officer Jones said that he taped off the crime scene and took several photographs, which were admitted into evidence. He affirmed that a red car ran up on the curb and into a dumpster. He testified that the left rear tire of the car was stuck in the ground, about halfway up the tire. He noted that there were two gunshot holes in the windshield and a red substance on the driver's seat. He testified that there was a baseball bat on the floor on the passenger side of the car. On cross-examination, the officer said that he did not collect the baseball bat as evidence because he did not have reason to believe it was part of the crime. He said that he had heard there was a "cut through" from the Orchid Manor Apartments to the Hillview apartments, but he could not say for sure because he had not seen the "cut through."

Paula Brandon testified that, on October 31, 2001, she was living in the Hillview apartments with the Defendant. She recalled that, on that morning, she was getting ready to go to school, and, on her way to catch the bus, she stopped by Ricky Dodson's[1] apartment to say "hi" to Dodson's mother, with whom Dodson lived. She testified that Dodson's apartment was located on the opposite side of the large Hillview apartments complex and a few minutes walk from her own. She

---

[1]At the time of the shooting in this case, Ricky Dodson used the name "Ricky Martin." For clarity and consistency, we will refer to him as Ricky Dodson throughout this opinion.

said that she was dating Dodson at that time, but she denied that she spent the night at his apartment. Brandon said that she missed her bus, so she walked through the park and through the Orchid Manor apartments to catch a bus at a different stop. She recalled that, while walking, the Defendant approached her, and he said that he needed to talk to her. She said that she and the Defendant walked across the park together while they were talking, but she could not recall the substance of that conversation. She testified that, as she and the Defendant walked, a red car that she did not recognize pulled into the driveway of the Orchid Manor apartments. Brandon testified that she did not know the man driving the car, and Dodson was in the passenger seat. She recalled that Dodson got out of the car and started walking towards the Defendant with a baseball bat raised over his head. She did not hear either man say anything, and she "ducked" and ran around the back of some houses nearby. She said that she returned about five minutes later and saw the same red car "on the sidewalk, with the hood up, pressing into the garbage can." Brandon testified that she was standing on the driver's side of the car screaming for the driver to get out of the car. She remembered that the car was still running, and the driver was trying to unfasten his seatbelt. She said that he raised his head, looked up, and then laid back down. She recalled that there were several other people standing nearby. Brandon said that she did not know where the Defendant was at that time, and she did not see him after she ran behind the nearby homes.

On cross-examination, Brandon testified that, when the Defendant approached her that morning, he was calm and did not seem angry. She said that, when Dodson pulled up, she was standing on the passenger side of the car, a short distance away. She explained that Dodson walked directly at the Defendant, holding the bat in his right hand above his head. Brandon testified that the Defendant had lived with her for approximately four years at the time of the shooting. She said that she remembered giving a statement to the police on October 31, 2001, and she said that she was worried at that time about being charged with a crime.

Dodson testified that, on October 31, 2001, the Defendant shot at him and Crawford. He said that Brandon was his girlfriend at the time, and she was living with him and his mother at the Hillview apartments. Dodson recalled that, on the morning of the shooting, he walked Brandon's kids to the day care bus and spoke with the bus driver. He said that he went to Crawford's apartment and requested that Crawford drive him to give Brandon a ride to school. Dodson admitted that there was a baseball bat on the floor of Crawford's car, but he denied putting the bat there. He said that he and Crawford drove to the Orchid Manor apartments and pulled into the driveway. Dodson said that he partially got out of the car, keeping one foot inside, and called to Brandon, who was about twenty or thirty feet away, that he would take her to school. He recalled that, as Brandon turned toward the car, he heard the first gunshot and saw the shot come through the car window. Dodson testified that he saw the Defendant after the first shot was fired. He said that he got back in the car to tell Crawford that the Defendant had a gun. He did not recall seeing the Defendant when he first saw Brandon, but he said that the Defendant came from the same general area where he saw Brandon. Dodson explained that the Defendant was on the driver's side of the car, approximately ten feet away, when Dodson first saw him. He recalled that Crawford was slumped over on the door, and his foot was on the brake. Dodson testified that he saw the Defendant walking to the car with a gun pointed at the windshield, and he jumped into the backseat of the car and crouched in the floor.

-4-

He said that after the second and third shot went through the windshield, he felt the car move forward and then stop. Dodson explained that he glanced around, and, believing that the Defendant had left the scene, he ran to his sister's nearby apartment to call the police. He recalled that he and his sister returned to the scene to find Crawford lying on the ground next to the car and the ambulance arriving on the scene.

Dodson testified that he had two prior confrontations with the Defendant, on May 2, 2001, and June 1, 2001. He said that the Defendant came to Brandon's house, and the Defendant threatened him with a knife and shot at him. Dodson explained that the Defendant came to Brandon's house a second time, while he and Brandon were sleeping, and fired several shots at Dodson as Dodson left the house.

On cross-examination, Dodson admitted that he had previously been convicted of felony theft and failure to appear in a felony case. Dodson said that, when he opened the door to give Brandon a ride, the baseball bat, which was lying on the floor between the passenger side seat and door, fell out of Crawford's car, and he picked it up and placed it back in the car. He did not recall previously testifying that the Defendant was walking next to Brandon when he arrived at the Orchid Manor apartments. He denied telling anyone that he attempted to shield Crawford from the gunshots. He admitted that he previously told the police that Crawford was "making an attempt to back up" when the shots were fired. He testified that Crawford had put the car into reverse, and he could not explain how the car moved forward after the shots. Dodson said that he could not remember during which of the two prior altercations the Defendant pulled a knife on him. He recalled that, after the Defendant pulled the knife, the Defendant fired several shots from six or seven feet away, but Dodson was never shot. Dodson recalled that, the night before the shooting, he went to Crawford's apartment and told Crawford and Tracy Valentine that he wanted to get a pistol.

Crystall Elliott testified that her sister, Tracy Valentine, was Crawford's girlfriend in October of 2001, and they all lived at the Hillview apartments. She recognized the baseball bat that was in Crawford's car the day of the shooting as the same bat that was usually kept inside the apartment. She recalled that, on October 31, 2001, Dodson and Crawford left Crawford's apartment together and took the bat with them. On cross-examination, Elliott testified that she did not actually know how the baseball bat got in the car.

Tracy Valentine testified that she was living in the Hillview apartments with her sister and Crawford on October 31, 2001. She said that she was at work the morning of the shooting. She recalled that the last time she had seen the baseball bat it was inside the apartment. She said that she spoke to Dodson at the hospital after Crawford was shot, and Dodson told her something about trying "to shield the car," which she did not interpret as Dodson trying to shield Crawford. On cross-examination, Valentine testified that Dodson was very upset when she saw him at the hospital, and Dodson said that the Defendant shot Crawford.

Following this evidence, the jury found the Defendant guilty of second degree murder, first degree felony murder, and attempted first degree murder. The trial court subsequently merged the

Defendant's conviction for second degree murder with the conviction for first degree felony murder. The trial court sentenced the Defendant to a life sentence for the first degree felony murder of Crawford, and it sentenced the Defendant to twenty years in prison for the attempted first degree murder of Dodson, with the sentences to be served concurrently.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his convictions; and (2) the trial court erred when it allowed the admission into evidence of certain photographs at trial.

## A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustain his conviction for the first degree premeditated murder of Crawford or the attempted first degree premeditated murder of Dodson. Specifically, the Defendant argues that the evidence is insufficient to support a finding of premeditation required for a conviction on a charge of first degree murder or attempted first degree murder. The State counters that the Defendant was not convicted of first degree premeditated murder, and the evidence is sufficient to sustain his convictions for second degree murder, first degree felony murder, and attempted first degree murder.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Carter, 121 S.W.3d 579, 588 (Tenn. 2003); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). This Court may not substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.; see State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Initially, we note that the Defendant was not, in fact, convicted of first degree premeditated murder. The jury found the Defendant guilty of second degree murder and first degree felony murder for the shooting and killing of Crawford. Furthermore, the Defendant conceded, in his brief on appeal to this Court, that the evidence is sufficient to sustain a conviction for second degree murder. Thus, the only question is whether the evidence is sufficient to sustain his conviction for the attempted first degree murder of Dodson. In the interest of justice, however, we will also address the sufficiency of the evidence supporting the Defendant's convictions for first degree felony murder and second degree murder.

## 1. Attempted First Degree Murder

The jury found the Defendant guilty of the attempted first degree murder of Dodson. A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part . . . ." Tenn. Code Ann. § 39-12-101(a)(2) (2003). First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1) (2003). Once a homicide has been established, it is presumed to be second degree murder, and the State has the burden of proving premeditation to raise the offense to first degree murder. State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999) (citing State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998)). Premeditation is defined as "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d).

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d). Premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct. State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing Brown, 836 S.W.2d at 539). "[T]he use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing" may support the existence of premeditation. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). This Court has also noted that the jury may infer premeditation from any planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995).

We conclude that, viewed in a light most favorable to the State, the evidence is sufficient to sustain the Defendant's conviction for the attempted first degree murder of Dodson. The Defendant, on two prior occasions, threatened Dodson with a knife and shot at Dodson. At the time of this incident, Dodson had stopped to offer his girlfriend a ride to school, and the Defendant began shooting at him without provocation. Dodson was unarmed, merely picking up a bat momentarily to return it to the car after it fell onto the ground. The Defendant had animosity towards Dodson because of their relationships to Dodson's girlfriend. This evidence is sufficient for a rational trier of fact to find that the Defendant acted with premeditation and intent in his attempt to kill Dodson. Although the Defendant argues that the jury's verdict is not rational because there were numerous inconsistencies between and within the accounts of the various witnesses, this Court does not re-weigh or re-evaluate the evidence on appeal. As noted above, the weight and value to be given to the evidence, and the credibility to be given to witnesses, is left to the jury. Liakas, 286 S.W.2d at 859. This issue is without merit.

## 2. First Degree Felony Murder

The jury found the Defendant guilty of the first degree felony murder of Crawford. First degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder . . . ." Tenn. Code Ann. § 39-13-202(a)(2) (2003). "No culpable mental state is required for conviction under subdivision (a)(2) . . . except the intent to commit the enumerated offenses or acts in such subdivisions." Tenn. Code Ann. § 39-13-202(b). We previously held that the evidence is sufficient to sustain the Defendant's conviction for the attempted first degree murder of Dodson, therefore, we also hold that the evidence is sufficient to sustain the Defendant's conviction for the first degree felony murder of Crawford. The evidence at trial showed that Crawford drove Dodson to offer Dodson's girlfriend a ride to school. The Defendant fired three shots into Crawford's car, attempting to shoot and kill Dodson. The Defendant, in fact, shot Crawford in the head, which caused numerous medical complications and eventually resulted in Crawford's death. This evidence is sufficient for a rational trier of fact to find that the Defendant shot and killed Crawford during his attempt to premeditatedly kill Dodson. Thus, the evidence is sufficient to sustain the Defendant's conviction for first degree felony murder.

## 3. Second Degree Murder

As explained above, the Defendant concedes that the evidence is sufficient to sustain his conviction for second degree murder, and we agree. A conviction for second degree murder requires proof that the defendant unlawfully and knowingly killed another. See Tenn. Code Ann. §§ 39-13-201, - 210(a)(1) (2003). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-302(b) (2003). "'A person can act knowingly irrespective of his or her desire that the conduct or result will occur.'" State v. Kelley, 34 S.W.3d 471, 478 (Tenn. Crim. App. 2000) (quoting State v. Gray, 960 S.W.2d 598, 604 (Tenn. Crim. App. 1997); State v. Rutherford, 879 S.W.2d 118, 120 (Tenn. Crim. App. 1993)). A homicide, once established, is presumed to be second degree murder. State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). The evidence at trial showed that the

Defendant fired three shots at Dodson, shooting Crawford in the head and, ultimately, causing his death. Although there was evidence that the Defendant was acting in self-defense, the jury rejected this theory, which is within its province. Thus, the evidence is sufficient to sustain the Defendant's conviction of second degree murder, and this issue is without merit.

## B. Rule 403 Relevance

The Defendant contends that the trial court abused its discretion when it admitted into evidence certain x-rays and photographs from Crawford's autopsy. Specifically, the Defendant asserts error in the admission of: (1) the two x-rays of Crawford's skull, which depicted large portions of missing skull, as a result of two craniotomies, and a bullet still inside Crawford's head; (2) a color photograph of Crawford's brain; and (3) a color photograph of Crawford's lung. The Defendant argues that the probative value of these exhibits was substantially outweighed by the danger of undue prejudice and confusion of the issues. The State counters that the trial court did not abuse its discretion in admitting these exhibits. We agree with the State.

The determination of the admissibility of photographs lies within the sound discretion of the trial court. State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992); State v. Evans, 838 S.W.2d 185, 193 (Tenn. 1992); see Neil P. Cohen, et al., *Tennessee Law of Evidence*, § 4.01[17][a], at 4-36 (4th ed. 2000). The decision of the trial court to admit a photograph into evidence "will not be overturned on appeal absent a clear showing of an abuse of discretion." State v. Vann, 976 S.W.2d 93, 103 (Tenn. 1998); see State v. Cazes, 875 S.W.2d 253, 262-63 (Tenn. 1994). To be admissible, a photograph must be relevant to some issue at trial and the danger of unfair prejudice, confusion of the issues, or misleading the jury must not substantially outweigh its probative value. Tenn. R. Evid. 403; State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); see Cohen, *supra*, § 4.01[17][d], at 4-38. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 951. This Court has explained that:

> Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of "bias, sympathy, hatred, contempt, retribution, or horror." Murder is an absolutely reprehensible crime. Yet our criminal justice system is designed to establish a forum for unimpaired reason, not emotional reaction. Evidence which only appeals to sympathies, conveys a sense of horror, or engenders an instinct to punish should be excluded.

State v. Collins, 986 S.W.2d 13, 19-20 (Tenn. Crim. App. 1998) (citations omitted). In deciding whether to admit photographs, the trial court must consider the questions of fact that the jury will have to consider in determining the accused's guilt, as well as other evidence that has been introduced during the course of the trial. State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995).

Regarding the admissibility of the autopsy photographs and x-rays, the State made the

following proffer of proof: Dr. Cynthia Gardner, the medical examiner who conducted the autopsy of Marcus Crawford, testified that Crawford was shot in October of 2001 and died after suffering complications from this gunshot wound and lingering in a coma for several months.  She said that, when she conducted the autopsy, she took photographs and x-rays to assist her in diagnosing and explaining the cause of death.  Dr. Gardner identified an x-ray of the frontal view of Crawford's skull, and she explained that this x-ray would assist her because it showed the location of the bullet and depicted some of the surgical intervention that Crawford required as a result of the bullet in his head.  Dr. Gardner said that a second x-ray of Crawford's skull, a side view of the skull, was helpful because it further demonstrated the size and location of the surgical intervention and the bullet in Crawford's skull.  The doctor explained that the surgical intervention erased the exterior evidence of the gunshot wound.  She testified that she took a picture of Crawford's brain during the autopsy, and she explained that the picture would assist her testimony because it showed that areas of the brain had been removed as a result of the gunshot and showed some discoloration from healing of remaining areas of the brain.  Dr. Gardner identified a photograph of a "slice" of Crawford's lung, and she said that the picture was helpful because it showed the immediate cause of Crawford's death–two infarcts, or dead areas, of the lung.  Dr. Gardner testified that the photographs would assist her in explaining the cause of Crawford's death to the jury.[2]

On cross-examination, Dr. Gardner testified that the two skull x-rays would help her explain to the jury where the bullet entered Crawford's skull.  She said that, although she could simply tell the jury her findings and conclusions from the autopsy, the pictures of Crawford's brain and lung would be helpful because the jury would be able to visualize what she would describe during her testimony.

Subsequently, the trial court ruled that these pictures were relevant under Rule 403 of the Tennessee Rules of Evidence.  Before the trial court ruled, the following exchange took place:

> **Trial Court**: [Is the Defense] stipulating that these things did occur to this victim in this case that caused his death?

> **Defense Counsel**: No, your Honor, we're not.  We're not stipulating cause of death.

> . . . .

> **Trial Court**: Are you alleging an intervening cause of death, rather than from the gunshot wound?

> **Defense Counsel**: [O]ur primary defense is self-defense.  But we are not waiving

---

[2]There were also further photographs of Crawford's lungs and a photograph of a filter placed in Crawford's vena cava, which showed several blood clots that were effectively caught by the filter, but the trial court ruled against admitting these photographs.  Further, there was a photograph of the bullet removed from Crawford's brain, and, although this photo was admitted, the Defendant does not argue error in its admission.

anything else.  And we think there may be another mechanism.

**Trial Court**: Or cause of death?

**Defense Counsel**: Yes, Sir.

The trial court stated, "Well, let me just say this . . . if there's [a] possibility of [an] intervening cause that may be asserted as a defense in this case, it makes it more important that the photographs be shown."  The trial court determined that the probative value of these photographs was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.  In making this determination, the trial court explained that the two x-rays of Crawford's skull would assist the jury because they showed how the physical evidence of the gunshot wound had been removed and showed the surgical intervention that was required.  The trial court explained that the photograph of Crawford's lung would be admitted because the defense disputed the cause of death and because the photograph would help the jury to understand the medical examiner's testimony.  Similarly, the trial court ruled that the photograph of the victim's brain was relevant to proving the cause of death and would help the jury in understanding the testimony.  The court determined that these two photographs, although color, were not so gruesome as to inflame the jury, and the court noted that a black and white photograph would not suitably depict the evidence.

We conclude that the trial court did not abuse its discretion in admitting the x-rays or the two color photographs.  The exhibits were relevant to the material issue of the cause of death, an issue that the Defense specifically told the court that it would contest.  Further, there was proof that the exhibits would assist Dr. Garner in her testimony, and, more importantly, assist the jury in understanding the doctor's testimony.  Although the x-rays and photographs are graphic, they are not gruesome.  The danger of unfair prejudice or confusion of the issues does not substantially outweigh the probative value of these exhibits.  This issue is without merit.

### III.  Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the Defendant's convictions and sentences.

_____
ROBERT W. WEDEMEYER, JUDGE

-11-